214 So.2d 198 (1968)
Mr. & Mrs. John Joseph POTTER, natural mother and father of Laurie Potter
v.
KROWN DRUGS, d/b/a Krown Drug Store et al.
No. 3155.
Court of Appeal of Louisiana, Fourth Circuit.
July 1, 1968.
Rehearing Denied October 7, 1968.
C. Monk Simons, III, and Gano D. Lemoine, Jr., New Orleans, for Wootan, Howcott, Simons & Lemoine, plaintiffs-appellees.
Carl J. Schumacher, Jr. and John William Futrell, of Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, for Krown Drugs, d/b/a Krown Drug Stores, Reese Dismukes and Insurance Co. of North America, defendants-appellants.
Before YARRUT, CHASEZ and BARNETTE, JJ.
CHASEZ, Judge.
This is a suit in tort in which the plaintiffs, Mr. and Mrs. John Potter have sued Krown Drugs, its employee, Reese Dismukes, and its insurer, Insurance Company of North America for damages which their child, Laurie Potter, allegedly sustained as a result of the improper dispensing of a prescribed medicine. The named defendants have answered the petition denying liability on several, diverse grounds. The trial on the merits was heard by the Civil District Court for the Parish of Orleans and judgment was awarded as follows: The plaintiffs were awarded the sum of $850.00 for their minor child's injuries; John Potter, father of the child and head of the community was awarded the sum of $116.00 for medical expenses; and the three named defendants were cast jointly *199 and in solido for these sums. Plaintiffs' claim on behalf of their personal damages was dismissed at their own costs. Expert fees in sums of $100.00 each to Dr. Gerald (Jerry) Casey, Dr. Henry Simon, and Mr. L. A. Wilson and $50.00 to Mr. H. K. Jepsen were taxed to defendants. Expert fee of Dr. G. A. Dildy in the sum of $100.00 to be paid by plaintiffs.
From that judgment defendants have appealed suspensively. Plaintiffs have answered the appeal seeking an increased award for their child and certain expert fees. No further appeal was made for their own personal damages.
The facts as contained in the record developed as follows: Laurie Potter, the three month old child of Mr. and Mrs. John J. Potter, suffered from an illness beginning in September, 1965, which was diagnosed as colic by their pediatrician, Dr. Jerry Casey. Dr. Casey prescribed a liquid pharmaceutical preparation known as Pediatric Piptal with Phenobarbital to be given the child for her colic. He telephoned Krown Drug Store on the night of September 13th, 1965, and spoke with a pharmacist, Reese Dismukes, specifically prescribing Pediatric Piptal with Phenobarbital which was to be administered in .5 cc dosages every eight hours. Mr. Dismukes dispensed a prepackaged drug which he testified was labeled Pediatric Piptal with Phenobarbital by Lakeside Laboratories which prepared it but later investigation proved that the pharmaceutical preparation dispensed was not Pediatric Piptal with Phenobarbital but some other substance which has not yet been positively identified.
It should be noted that the pharmacist in question did not prepare this drug for human consumption. He merely selected the prepackaged preparation from his stock, removed the manufacturer's label, and replaced it with the Krown Drugs' label. It should be further noted that in this situation, the standard of care for the pharmacist is extremely high for he must ascertain that the drug he dispenses is exactly that prescribed by the physician. He is also responsible for any signs of deterioration which might be observed from the prepackaged pharmaceutical.
The drug in question was delivered to plaintiff's house that night, but it wasn't given to the child until September 15th. After that date it was administered on two other occasions until the mother noticed that the child began having black stools around the 17th of September. Mrs. Potter also noticed the child appeared to be more cross than usual and was crying more often. She then called Dr. Casey who suggested she be put on a bland diet. The black colored stools continued and Mrs. Potter called Dr. Casey on the night of September 23rd so that he might examine the child.
Dr. Casey examined the child the night of September 23rd and again according to his records on September 24th. He found nothing abnormal about the child physically, except that the stool which was tested for the presence of occult blood showed a positive result. A blood count was also taken, but it proved to be normal. The doctor then prescribed that the child be taken off the medication and be given a bland diet. He suggested that the parents should observe the child and that they should specifically look for bright red blood in the stools.
Dr. Casey later decided to admit the small child to Southern Baptist Hospital in order that more complete tests might be taken. The tests he prescribed were to determine if Laurie Potter were more susceptible to bleeding than other children. A G. I. series in the small bowel was given and it resulted in a negative finding. The blood tests given resulted in a normal blood count as well as normal clotting and prothrombin time. The Hematest for blood in the stool did, however, show the presence of occult blood.
The final conclusion drawn by Dr. Casey from these tests was that he could not find *200 the specific cause of internal bleeding. There was no evidence of a bleeding point because the tests revealed neither an ulcer nor any gross lesion which could have been detected by X-ray. Thus, the complaint of black stools which showed some trace of blood remained, but the physicians could find no demonstrable cause for this condition. The child was discharged from the hospital on September 29th.
The child was once again brought to Dr. Casey for black stool on October 4th. At this time a slight trace of blood was found, but she had suffered no loss of blood. On October 15th, the grandmother brought the child to Dr. Casey again, but at that time her black stools were traced to her having eaten beets, since the blood test was negative.
The injury then as revealed in the record of facts is that the child had a history of black stools beginning around September 13th and this continued intermittently until October 15th. Because of the evidence of blood in the stool, the child was admitted into the hospital for extensive tests but the tests did not reveal the cause of either the black color or the evidence of blood in the stool.
The expert testimony contained in the record reveals that a black colored stool is not in itself abnormal in infant children and can be caused by a variety of digested matter. Dr. Henry Simon, an expert pediatrician testified that foods containing iron can cause a black stool. For example, beets, spinach, baby's formula milk, the dry milk product Similac, the drugs containing bismuth such as Pepto Bismal can cause a black stool. Blood also can cause a black stool, but Dr. Simon stated that the Hematest given Laurie Potter should have had a higher result in order to identify the blood as the sole cause for the black color of her stool.[1] He further stated that the Hematest is very accurate in determining the presence of blood, but it will not relate the possible presence of iron which could also cause the black color.
Thus the conclusion which is inevitably reached in the analysis of this evidence is that the child had a black stool of some unknown cause and it contained some blood as revealed by the Hematest. The amount of blood in the stool was not enough to cause its black color. The presence of blood did alert the physician as to the possibility of some internal bleeding point and for that reason the more extensive tests were prescribed. The results of those tests as discussed hereinafter were not conclusive as a specific cause of the presence of blood, but they were helpful in the complete diagnosis and treatment of this child. Thus, we are left with the conclusion that neither of the doctors could determine the cause of the black stool, and the next question posed is, could the drug have caused the internal bleeding?
The negligence on which this suit is based involves the pharmacist's alleged failure to dispense the drug as prescribed by Dr. Casey. Mr. Dismukes testified that he was very careful in selecting the drug from his stock of drugs prepared and packaged by the manufacturer. He stated he personally received the prescription from Dr. Casey, recorded the name of the drug himself, and then selected the drug from his supplies. The drug he selected was from its original package and Mr. Dismukes testified that he checked the label carefully to see if it corresponded to the prescription. Upon assuring himself that he had made no mistake, he removed the manufacturer's label and replaced it with the Krown Drug label.
Later tests revealed that the drug which was labeled and dispensed by Mr. Dismukes is not identical to the preparation *201 positively identified as Pediatric Piptal with Phenobarbital. In fact not only are the two pharmaceuticals which were supposedly prepared by the same manufacturer colored differently, but the stoppers in the bottles are dissimilar. The stopper in the dispensed drug was marked in .6 cc graduation, when it should have been a .5 cc measure as prescribed by Dr. Casey. Also chemical analysis demonstrated that in four tests the substance dispensed was not identical to the drug known as Pediatric Piptal with Phenobarbital.[2] Neither was it identical with a similar drug known as Pediatric Piptal Antipyretic which is also sometimes used in the treatment of colic.
There is nothing in the record which shows what the dispensed drug is. We only know that it is not identical in chemical composition to Pediatric Piptal Antipyretic or Pediatric Piptal with Phenobarbital. Neither is it Piptal-PHB Elixir which was also tested. Thus, we must conclude that fault is attributed to the defendants' negligence because they are responsible for the improper dispensing of a pharmaceutical preparation.
To recover in tort, however, one must prove that the fault attributed to the defendants actually caused the damage incurred. And while we agree with the trial judge that the element of fault is present, we are not so positive as to the existence of the other elements of tort. Without discussing the extent of injury in particular detail, we note that the only demonstrable damage was a black stool which contained evidence of occult blood. Because of these blood traces, the plaintiffs incurred certain expenses on advice of a physician to ascertain the cause of the occult blood and to have the child properly treated. The expenses assessed by the trial court amounted to $116.00 in medical damages. The court also found $850.00 in damages for the pain and suffering of the child.
Although we agree that the trial court properly assessed the damages, we are concerned with its conclusion that these damages were in fact caused by the defendants. And on this appeal we feel the only viable question before this court is whether the element of causation has been proved so that the plaintiffs can recover from those allegedly responsible for the damages.
The lower court did find as a conclusion of fact that defendants' negligence was the cause of the injuries suffered by the infant. Although in its reasons for judgment the lower court stated that some doubt remains because the evidence does not conclusively dispose of all reasonable explanations, it was led to its conclusion by the plaintiff having satisfied his burden of proof. The question then which remains on appeal is whether the trial court erred in its analysis of the facts, and whether its conclusion on the element of causation was supported by that proof necessary to grant a judgment in favor of the plaintiffs.
We find no evidence which shows the specific cause of the black color of the infant's stool nor do we find an explanation for the presence of blood in the stool. It is admitted that among other things blood may be a cause for black stool and caustic drugs may be a cause for blood in the stool of an infant child, but the record does not contain one scintilla of proof that the drug dispensed could cause either the presence of blood or the black color found in the stool of this child.
Although the plaintiff went to great lengths to have the drug chemically analyzed, the evidence derived therefrom reveals only that the drug dispensed was not *202 identical to three control samples tested. The tests conducted by well-trained and responsible technicians do not show what the drug is nor what it is chemically composed of except that unlike the other three samples, it did not contain barbituric acid. This lack of Barbituric acid is indicative that the drug dispensed was not Pediatric Piptal Antipyretic. The tests that were conducted show only that the drug dispensed was dissimilar to, not identical to the control samples, Pediatric Piptal with Phenobarbital and Piptal-PHB Elixir.
One interesting result of the pH test is the fact that all of the drugs tested had a mild acidity with pH factors which varied within approximately one point of each other. In fact, one can conclude from this information that none of the drugs tested could be considered sufficiently caustic to be identified as the cause of internal bleeding in this infant. Since Dr. Casey, the treating physician, definitely stated that Pediatric Piptal with Phenobarbital could not have caused this blood, and since the dispensed drug was within one point of Pediatric Piptal with Phenobarbital on the pH scale of acidity, both of which are classified as weak acids, then this substance could not be the cause of an internal bleeding point due to its acidity.
Thus, the record discloses only that the pharmacist named defendant was negligent in that he dispensed a drug which is not chemically identical to that which Dr. Casey prescribed. This negligence is fault on which the plaintiffs could recover for whatever injuries Laurie Potter sustained if those injuries were caused by the drug actually dispensed.
We cannot conclude from any of the evidence submitted to the court that there is sufficient proof to sustain the causation element of this alleged tort. In fact the chemical analysis of the unknown substance serves only to prove that it was not a drug with a strong acidity which could possibly cause internal bleeding. Nor did the tests show it contained any harmful substance which did in fact injure this infant child. Further we are convinced that there is a definite lack of proof connecting this drug and the black stools or the presence of blood therein. Therefore, we find that the trial court erred in its finding of fact in that the only proof disclosed by the record in this case is that no evidence exists connecting the drug dispensed with the injury complained of. Because of this lack of proof we must reverse the judgment of the court a qua and dismiss the plaintiffs' claims.
Therefore it is ordered, adjudged and decreed that the judgment of the court a qua rendered and signed on the 23rd day of January, 1968, in favor of plaintiffs Mr. and Mrs. John Joseph Potter, natural mother and father of Laurie Potter, against the defendants, Krown Drugs, d/b/a Krown Drug Store, Reese Dismukes and the Insurance Company of North America, is reversed and set aside; and judgment is now rendered herein in favor of Krown Drugs, doing business as Krown Drug Store, Reese Dismukes and the Insurance Company of North America, dismissing the suit filed herein by plaintiffs Mr. and Mrs. John Joseph Potter, natural father and mother of Laurie Potter.
All costs in this matter in both the District Court and this Court shall be paid by the plaintiffs.
Reversed and rendered.
NOTES
[1] The Hematest is a very sensitive test for the presence of blood. The highest result obtained from the Laurie Potter stool samples was a 2 plus. The 2 plus reading is evidence of some blood in the stool, but in order to identify blood as the element causing the stool to appear black the result should be a very positive 4 plus reading.
[2] The four tests were: 1) Ultraviolet Absorbtion Spectroscopy; 2) Thin layer Chromatography; 3) pH; and 4) Color tests for Barbituric Acid. The tests were given to identify or detect the similarity of two unknown samples with two control samples of Piptal-PHB Elixir and Pediatric Piptal with Phenobarbital.